Ophie Mae **WORKMAN**, Appellant,

v.

**WESLEY MANOR METHODIST HOME,
et al., Appellees.**

Court of Appeals of Kentucky.

Jan. 29, 1971.

Stanley A. Stratford and Walter T. Collins, Louisville, for appellant.

Larry M. Johnson, James M. Graves, William P. Swain, Boehl, Stopher, Graves & Deindoerfer, Louisville, for appellees.

Gemma Harding, Louisville, P. Keller Whitaker, Workmen's Compensation Bd., Frankfort, for Special Fund.

PALMORE, Judge

The appellant, Ophie Mae Workman, fell and broke her hip in the course of her employment with the appellee Wesley Manor Methodist Home. In this workmen's compensation proceeding she appeals from a judgment affirming a determination by the Workmen's Compensation Board tersely finding that the accident "did not arise out of and in the course of her employment with the Defendant." Cf. KRS 342.005.

The injury occurred on February 24, 1966, at which time Mrs. Workman was 67 years of age. She was employed by Wesley Manor Methodist Home to set tables. According to her testimony in this proceeding, given on April 10, 1968, after she had finished setting a table she turned, twisted her left leg, and fell to the floor, thereby fracturing her left hip.

Prior to the time of the hip injury Mrs. Workman had suffered injuries to her back in two separate automobile accidents, one on February 14, 1964, and the other on November 3, 1965, following each of which she had brought suit against other parties for her damages. The second of these two damage suits was pending at the time she broke her hip, and on March 8, 1967, in that action, she testified in a deposition as follows:

Q. "Describe that fall."

A. "Well, I just standing out in the floor with a spoon in my hand and my back just give away and down I went."

*   *   *   *   *   *

Q. "Did you slip on anything?"

A. "No sir."

Q. "Trip over anything?"

A. "No, just standing up with the teaspoon and I had done set my plates and my knives and forks and laid the spoon down, had it in my hand and laid it down and down I went."

*   *   *   *   *   *

Q. "Did you feel any kind of sharp pain or anything at the time you went down?"

A. "My back, but it had been giving me trouble ever since the 20th of February and that morning before I went up there, I fell on the bed, it caught me and I went in to take a bath and fell on the commode and it caught me and then I went up there and it gave way again."

Q. "So it gave way two or three times during that period?"

A. "Right, and I had been having pains, severest."

*   *   *   *   *   *

Q. "You were setting tables?"

A. "I had done set it."

Q. "Okay. Just standing there?"

A. "Just standing there."

Q. "And as far as you know, you didn't slip on anything slick or anything at all?"

A. "No."

Q. "You were just standing there?"

A. "Just standing still and my back give way on me and down I went."

Q. "All right. Now then, you had fallen, I believe, in the bathroom?"

A. "That morning before I went to work."

Q. "That was at home, it was at your home?"

A. "Yes, the 25th."

Q. "But you caught yourself—

A. (Interrupting) "That morning I fell—but I first fell on the bed, give way on the bed and then I went to

get a bath and give in in the bathroom and I caught the commode and sat down on it."

Q. "Had you ever fallen before those three occasions?"

A. "Well, I had almost. I caught myself."

Q. "When was that?"

A. "I didn't fall down."

Q. "When was that?"

A. "That was during that week some time. I don't remember what day it was, but it seems like it was giving away on me."

She further testified that she had been wearing a back brace but had taken it off about three days before for the purpose of sending it to be cleaned.

Subsequently, while under cross-examination in the instant proceeding, Mrs. Workman professed not to recall these answers she had given in the earlier tort action, and explained that she had been under heavy medication when so testifying. She denied having experienced pain in her back shortly before or at the time of her fall at Wesley Manor and said she had theretofore discontinued using the back brace because she no longer needed it, and not because she had sent it to the cleaners. The 1967 deposition in the damage suit was introduced as evidence against Mrs. Workman during the course of this compensation proceeding.

Dr. William C. Mitchell, Mrs. Workman's treating physician, was interrogated and cross-examined to the point of exasperation on the question of precisely what caused her to fall, and the net effect of his testimony was that he could do no more than speculate.

The case falls in the general category described by Larson as the "unexplained fall" cases. See Larson, Workmen's Compensation Law, § 10.31. The essential problem was discussed in Coomes v. Robertson Lumber Co., Ky., 427 S.W.2d 809 (1968), in which this court held that an unexplained fall in the course of one's employment gives rise to a rebuttable presumption that it arose "out of" the employment as well. Stated another way, when an employe during the course of his work suffers a fall by reason of some cause that cannot be determined, there is a natural inference that the work had something to do with it, in the sense that had he not been at work he probably would not have fallen. Mindful of the statutory admonition to construe the law liberally,[1] this and most other courts have elevated that inference to the status of a rebuttable presumption, or prima facie case, which means from a procedural standpoint that in the absence of evidence sufficient to cast substantial doubt in the mind of a reasonable man that the presumption is correct the employe is entitled to its benefit as a matter of law.[2] In blunt terms this means that without such rebutting evidence the board cannot find against him on the issue of whether the accident arose out of the employment.

On the other hand, if the defendant employer comes forward with sufficient evidence that the work was not a contributing cause to raise a substantial doubt that it was, then the rebuttable presumption is reduced to a permissible inference and the board is free either to find or decline to find that it was. The countervailing defensive evidence need not be "substantial" in that it would support a positive conclusion that the work was not a contributing cause; it need only cast enough doubt on the validity of the initial presumption in the case at hand to justify a reasonable man in disregarding it. Cf.

1. KRS 342.004.

2. The procedural effect to be accorded the evidence adduced in a given case is a question of law as distinguished from a question of evidence.

Blankenship v. Lloyd Blankenship Coal Co., Ky., 463 S.W.2d 62 (1970). It must, however, when considered together with all the other evidence in the case, have enough substance to satisfy the "reasonable man" test as it has been expressed here and in various precedents discussed and cited in Blankenship.[3]

Literally, the board in this case made a positive finding of fact that the injury did not arise out of and in the course of the employment. A negative finding to the simple effect that the claimant had not satisfied the burden of proving that the injury arose out of the employment would have been a preferable form, because (1) that is as far as the board needed to go in its findings and (2) the evidence may not have been sufficient (though we need not decide the point) to warrant a finding which, in substance, determines as a positive fact that the injury would have occurred independently and regardless of the employment. This technical nicety does not have any great practical significance in this particular instance, but we mention it here because from time to time when the board goes further than it needs to go and, instead of making a negative finding to the effect that the claimant has not satisfied his burden, makes a positive converse finding, it invites the spurious argument that such a finding is not supported by substantial evidence, when in fact it is unnecessary that a merely negative finding be so supported. See, for example, Ireland v. Liberty Mut. Ins. Co., Ky., 462 S.W.2d 903 (decided today); Blankenship v. Lloyd Blankenship Coal Co., Ky., 463 S.W.2d 62 (1970); Porter v. Goad, Ky., 404 S.W.2d 795; and Lee v. International Harvester Co., Ky., 373 S.W.2d 418 (1963), in which the distinction is exemplified and discussed.

Reviewing the case according to the foregoing rationale, we see it as follows: Mrs. Workman's testimony in this proceeding would have entitled her as a matter of law to a favorable finding had there been no rebutting or countervailing evidence on the issue of causation, but the subsequently introduced content of what she had said while testifying in the damage suit constituted enough evidence that the accident resulted solely from the weakened condition of her back, and not in any respect from the performance of her work, to reduce the rebuttable presumption in her favor to a permissible inference, leaving the board free either to decide in her favor or to remain unpersuaded, as it did, that her work was a causative factor in precipitating the injury. That being the case, the circuit court was correct in not disturbing the action of the board.

Our discussion thus far presupposes, of course, that an injury from a fall resulting during the course of the employment but solely from a cause or causes to which the work is not a contributing factor is not compensable. This may appear to draw a fine line of distinction from the positional risk cases such as Corken v. Corken Steel Products, Inc., Ky., 385 S.W.2d 949 (1965), based on the theory that the injurious incident would not have occurred except for the employe's presence at the particular place where it happened. However, it is the "basic rule, on which there is general agreement." Larson, Workmen's Compensation Law, § 12.11. The positional risk theory applies in this type of case only "if the employment places the employee in a position increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle.[4] The currently controversial ques-

---

3. This approach is not indigenous to workmen's compensation cases, of course. The same fundamental principle applies to any case involving fact-finding, whether by jury or otherwise. See, for example, Lee v. Tucker, Ky., 365 S.W.2d 849 (1963); Bell & Koch, Inc. v. Stanley, Ky., 375 S.W.2d 696 (1964); Scott v. Patterson, Ky., 400 S.W.2d 526 (1966).

4. In Stasel v. American Radiator & Standard San. Corp., Ky., 278 S.W.2d 721 (1955), for example, the claimant either fell against a hot stove or scraped his

tion is whether the effects of an idiopathic fall to the level ground or bare floor should be deemed to arise out of the employment." *Ibid.*

"Inevitably there arrive the cases in which the employee suffers an idiopathic fall while standing on a level surface, and in the course of his fall, hits no machinery, bookcases, or tables. At this point there is an obvious temptation to say that there is no way of distinguishing between a fall onto a table and a fall onto· a floor, since in either case the hazard encountered in the fall was not conspicuously different from what it might have been at home. A distinct majority of jurisdictions, however, have resisted this temptation and have denied compensation in level-fall cases. The reason is that the basic cause of the harm is personal, and that the employment does not significantly add to the risk.

"It should be stressed that this requirement of some employment contribution to the risk in idiopathic-fall injuries, is a quite different matter from the requirement of increased risk in, say, lightning cases. The idiopathic-fall cases begin as personal-risk cases. There is therefore ample reason to assign the resulting loss to the employee personally. The lightning cases begin as neutral-risk cases. There is therefore no reason whatever to assign the resulting loss to the employee personally. To shift the lost [sic] in the idiopathic-fall cases to the employment, then it is reasonable to require a showing of at least some substantial employment contribution to the harm. But in the neutral-risk cases, the question is not one of shifting the loss away from a prima facie assignment to the employee at all, since there has never been ground for any such assignment; all that is needed to tip the scales in the

arms in hot sand, thereby sustaining burns which would not have been inflicted

direction of employment connection, under the positional-risk theory, is the fact that the employment brought the employee to the place at the time he was injured—an extremely lightweight causal factor, but enough to tip scales that are otherwise perfectly evenly balanced." Larson, Workmen's Compensation Law, § 12.14.

So, to recapitulate in terms of Larson's discussion, we begin with a ·fall that is not strictly "unexplained," since the claimant's testimony suggests it was caused, at least in part, by a turning or twisting movement executed by her in response to the demands of her employment. But as we have said, under the whole state of the evidence developed in the case the board was not bound to and did not accept her explanation. If we stop right there, and pursue the analysis no further, we have a purely unexplained fall, for which the resulting disability would be compensable. However, the defensive evidence not only justified the board in rejecting her explanation, but it also contained sufficient indication that the cause of the fall was exclusively idiopathic to negate the technical presumption that it was not.

As Larson observes, "while most of the qualities, virtues, and faults of daily life vary by infinitesimal degrees, rules of law must, by their very nature, proceed by categories. Lines must be drawn, on either side of which occur situations that seem so similar that to attach widely different consequences to them may seem ridiculous and cruel," but still the lines must be drawn somewhere. Larson, Workmen's Compensation Law, § 12.14. This simply is one of those hairline cases.

The judgment is affirmed.

All concur.

but for the circumstances of his employment.