INDIAN LEASING COMPANY and Chubb & Sons, Inc., Appellants,

v.

Marshall H. TURBYFILL, Deceased, Carolyn J. Turbyfill, widow, James R. Yocom, Commissioner of Labor and Custodian of the Special Fund, and the Workmen's Compensation Board, Appellees.

Court of Appeals of Kentucky.

Nov. 10, 1978.

Discretionary Review Denied March 13, 1979.

William P. Swain, Larry L. Johnson, Boehl, Stopher, Graves & Deindoerfer, Louisville, for appellants.

Carl W. Brown, Handmaker, Weber & Meyer, Louisville, Niles S. Nimmo, Nash-

ville, Tenn., for appellee Marshall H. Turbyfill, Deceased and Carolyn J. Turbyfill, Widow.

Kenneth E. Hollis, Gen. Counsel, Dept. of Labor, Frankfort, John Riehl, Jr., Asst. Counsel, Dept. of Labor, Louisville, for appellee James R. Yocom, etc.

Before HAYES, PARK and REYNOLDS, JJ.

PARK, Judge.

This workmen's compensation appeal presents the issue of apportionment of liability between the employer and the Special Fund for the consequences of a heart attack suffered by Marshall Turbyfill while employed by Indian Leasing Co. as a truck driver. On April 9, 1975, Turbyfill suffered a heart attack as he was working atop an Indian Leasing Company trailer attempting to cover a load of plywood with a heavy tarpaulin. Turbyfill died when he fell 12 feet crushing his skull on the concrete below. The Workmen's Compensation Board awarded death benefits to Turbyfill's widow, apportioning liability 95% to Indian Leasing and 5% to the Special Fund. Indian Leasing appeals from a judgment of the Hopkins Circuit Court upholding the award of the board. The Special Fund has not appealed.

I

The essential facts are not in dispute. Turbyfill was suffering from advanced atherosclerosis prior to his death on April 9, 1975. However, his atherosclerosis had not interfered with his ability to perform his job as a truck driver for Indian Leasing. On the day in question, Turbyfill suffered a coronary occlusion resulting in a myocardial infarction. He lost consciousness falling 12 feet to the concrete where he received crushing injuries to his skull and lacerations of the brain.

The medical evidence established that the coronary occlusion and resulting myocardial infarction were the result of Turbyfill's work exertion acting upon his pre-existing atherosclerosis. The evidence also indicated that the immediate cause of death was the fall which crushed his skull. According to Dr. Charles Cook, the local coroner who performed the autopsy, Turbyfill died instantaneously when his skull struck the concrete. Dr. Cook further testified that the large pool of blood found around Turbyfill's head indicated that his heart was still pumping when his head struck the concrete. The board also considered the testimony of Dr. F. Albert Olash who was appointed by the board pursuant to KRS 342.121. Based upon his examination of the record before the board, Dr. Olash concluded that death was caused by the fractured skull and brain laceration. He testified that the skull fracture would have caused the death of a person with a normal heart who had not suffered a myocardial infarction. Both Dr. Cook and Dr. Olash attributed Turbyfill's fall to the myocardial infarction which caused him to lose consciousness while working atop the load of plywood on the trailer.

The board made the following findings of fact concerning Turbyfill's death:

[a] The work-related incidents were not the sole causative factors in the decedent's death.

[b] The decedent suffered no active occupational disability immediately prior to April 9, 1975 so as to make an exclusion from the Award.

[c] The work-related fortuitous [sic] unexpected harmful change in decedent's organism and the fall solely and independently attributed [sic] to the death of Marshall H. Turbyfill to the extent of 95%. The Defendant-employer is liable for this portion.

[d] The remaining 5% of the causative factor of the death arose from the arousal of a dormant nondisabling disease or condition (atherosclerotic heart disease) into disabling reality. The Special Fund is liable for this portion.

Dr. Cook did not give an opinion on the percentage of causation of the various factors leading to Turbyfill's death. Consequently, the appeal of Indian Leasing is based largely on the testimony of Dr. Olash

who did attempt to apportion the cause of death by giving percentages of causation.

Dr. Olash testified that 90% of the cause of death was attributable to the fractured skull and brain laceration. The remaining 10% of causation was attributed to the pre-existing atherosclerosis which, when acted upon by the work exertion, resulted in the myocardial infarction with loss of consciousness which caused him to fall off of the truck. Dr. Olash was also asked whether Turbyfill would have died from the myocardial infarction had he not fallen twelve feet onto the concrete. Dr. Olash testified:

A. I cannot really state that in the individual case. I can say this, that *he certainly had significant cardiac disease and in all probability, would have been disabled to a moderate or marked degree on the basis of his cardiovascular disease, should he have lived through the episode of his cardiovascular disease and not have died for any other reason.* There is a possibility, still, that he very well may have died on the basis of his cardiovascular disease itself. This is unpredictable, but all I can say is that basically, you have to look at these with the idea of the basic statistics that cover all coronaries and say that he fits into these particular statistics, somewhere, that 50% of the people with myocardial infarctions die with their acute myocardial infarctions, before they get to see a doctor. He had already lived through this particular episode, of those 50% who get to see a doctor, another somewhere in the neighborhood of eight or ten percent die in the coronary care unit in a hospital, whether he would have lived through that or not, I don't know, so *I would say that he probably had 80% to 85% chance of living through his myocardial infarction, since he had already lived through the initial episode of it.* (emphasis added)

On the assumption that Turbyfill had not fallen but had survived the myocardial infarction, Dr. Olash testified that he would have apportioned Turbyfill's disability resulting from the myocardial infarction 75% to the pre-existing atherosclerotic heart disease and 25% to the work connected incident of stress and exertion. It is this latter opinion which forms the basis for Indian Leasing's appeal.

## II

The appeal of Indian Leasing is based upon the premise that liability for his death must be apportioned solely on the basis of the causes of the myocardial infarction. The fall was the result of Turbyfill's loss of consciousness; his loss of consciousness was the result of the myocardial infarction; and the myocardial infarction was largely the result of the pre-existing atherosclerotic disease. Therefore, Indian Leasing reasons, the board erred in failing to apportion the major share of the liability against the Special Fund. Indian Leasing's argument overlooks one important fact. Turbyfill's employment by Indian Leasing placed him on top of the loaded trailer where there was the risk of falling to the concrete below. The dangerous effects of the myocardial infarction were increased by the fact that he was working 12 feet off the ground.

In his discussion of idiopathic fall cases, Larson sets forth the increased danger rule:

When an employee, solely because of a nonoccupational heart attack, epileptic fit, or fainting spell, falls and sustains a skull fracture or other injury, the question arises whether the skull fracture (as distinguished from the internal effects of the heart attack or disease, which of course are not compensable) is an injury arising out of the employment.

The basic rule, for which there is now general agreement, is that the effects of such a fall are compensable if the employment placed the employee in a position increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle.

A. Larson, *Workmen's Compensation Law,* § 12.11, pgs. 3–252–56 (1978). Larson recognizes that the question of causation must be determined before the increased danger rule can be applied to idiopathic falls.

The issue in this section must be carefully distinguished from the medical question

whether the final injury or death was in fact the result of the fall itself, rather than of the heart attack or other idiopathic condition. When a man suffers a severe blow on the head and a heart attack in one accident, it becomes necessary to disentangle the chain of causation and determine whether it was the head injury or the heart condition that caused the death.

*Id.* § 12.11, footnote 1. Two Kentucky decisions are good examples of the application and limits of the "increased danger" rule as applied to idiopathic falls.

In *Stasel v. American Radiator & Standard Sanitary Corp.*, Ky., 278 S.W.2d 721 (1955), the court upheld the board's award of compensation benefits to an employee who suffered serious abrasions and burns when he fell against a hot stove or upon hot sand. The fall was caused by an epileptic seizure. After discussing the increased danger rule as applied to idiopathic falls, the court held:

> While we do not undertake to say here whether or not a recovery should be allowed in every case in which an employee, due to illness or for some other similar reason, suffers injuries in a fall, we do think that the evidence is sufficient in the present case to support an award of compensation. The appellant does not claim compensation for injuries caused by his idiopathic condition, but seeks compensation for severe burns he received from falling into the hot stove, or the hot sand. *McCarthy v. General Electric Co.*, 293 Pa. 448, 143 A. 116, 60 A.L.R. 1288. The fall was brought about by either a personal cause, or an employment cause, or a combination of both. The law does not weigh the relative importance of the two causes, nor look for primary and secondary causes, it merely inquires whether the employment was a contributing factor. See, *Larson's Compensation Law*, Vol. 1, Sec. 7.40, p. 50.
>
> The appellant was hired to work in appellee's plant after passing a pre-employment physical examination; he was required to wear a special face mask to protect his respiratory system; there were unusual hazards and risks in the physical conditions of his place of work; and he became unconscious while performing his duties and fell into a hot stove or hot sand and suffered severe burns. Therefore, under these facts the only fair and reasonable finding that could be made was that the peculiar hazards of his employment were a contributing factor to his accident and injury. We think there affirmatively appears a clear causal connection between the conditions under which the appellant was working and the occurrence of the injury.

*Id.*, 278 S.W.2d at 724. Two judges dissented asserting that the injuries were not compensable in the absence of some causal connection between his employment and the epileptic seizure. The dissenting opinion distinguished the case from one in which there was some connection between the employment and the cause of the fall, stating:

> His case is not like that of a workman with a weak heart who falls and injures himself on account of a heart attack brought on by over exertion, excessive heat, lack of air, undue excitement or any other condition which might cause him to collapse and injure himself in a fall. In such a case, the workman would be entitled to compensation as his injury would have a causal connection with his work or employment.

Sims, Judge, dissenting, *Id.*, 278 S.W.2d at 725.

In *Workman v. Wesley Manor Methodist Home*, Ky., 462 S.W.2d 898 (1971), the court upheld a determination by the board that the employee's injuries did not arise out of her employment. The employee sought to recover compensation benefits for injuries suffered when she fell at work while standing on a level floor. The court declined to extend the positional risk theory to idiopathic falls on level surfaces when the employment in no way increased the risk of injury. Liability under the positional risk theory for idiopathic falls is limited to those cases in which the employment placed the employee in a position increasing

the dangerous effects of the idiopathic fall. The *Stasel* case was treated as having been decided under the positional risk theory. *Id.*, 462 S.W.2d at 904, footnote 4. In level fall cases involving no increased danger attributable to the employment, liability may be imposed on the employer only if the work was a substantial factor in causing the injury. In the *Workman* case, the court held that there was a rebuttable presumption that an unexplained fall during the course of employment was work-related. However, the court found that the rebuttable presumption had been reduced to a permissible inference by evidence that the employee's fall was not unexplained but resulted solely from a prior back condition which was not work-related. Consequently, the board was not compelled to find that the employment was a causative factor in precipitating the employee's injuries.

■■■■ Turbyfill's work was a substantial factor in causing his fall. Although the immediate cause of his fall was loss of consciousness from the myocardial infarction, the myocardial infarction was in turn caused by the stress and exertion of handling the heavy tarpaulins acting upon the pre-existing atherosclerotic condition. If he had died immediately from the myocardial infarction before falling, there would be much merit to the argument that the board erred in failing to apportion liability between the Special Fund and Indian Leasing solely on the basis of causation of the myocardial infarction. However, the argument of Indian Leasing ignores the consequences of the fall itself.

Turbyfill's employment placed him atop the loaded trailer where the risk of injury from any fall was greatly magnified. There was substantial evidence that he did not die from the myocardial infarction which caused the fall. Rather, the evidence supports a finding that he died from the results of the fall, namely the crushing skull injuries and brain laceration received when his head struck the concrete. The board could find that Turbyfill would have survived had he not suffered the myocardial infarction at work.

In imposing liability upon Indian Leasing for 95% of the compensation, the board found that "the fall solely and independently" contributed to Turbyfill's death. In addition, the board found that he had suffered a "work-related fortuitous unexpected harmful change in his organism." This was, in effect, a finding of a causal connection between Turbyfill's work and the myocardial infarction. *See Moore v. Square D Co.*, 518 S.W.2d 781, 784 (1974). The remaining causation was attributable to the arousal of the dormant non-disabling atherosclerotic heart disease. Thus, the board apportioned liability on the basis of the results of this fall itself as well as the factors causing the fall. *Cf. A. C. Lawrence Co. v. Barnhill*, 249 Ky. 437, 445, 61 S.W.2d 1, 4 (1933). Under the circumstances of this case, we conclude that the board did not err when it imposed upon Indian Leasing 95% of the liability to pay compensation. Turbyfill died immediately from the effects of the fall itself. Had Turbyfill not been working atop the loaded trailer, it is likely that he would have survived the myocardial infarction. When the employment places the employee in a position of danger increasing the effects of a fall, the Special Fund should not be required to relieve the employer of liability for the results of the fall alone. It was the function of the board to apportion the percentages of disability, and the circuit court did not err in refusing to disturb the board's award. *Holman Enterprises Tobacco Warehouse v. Carter*, Ky., 536 S.W.2d 461 (1976).

The judgment of the circuit court is affirmed.

All concur.