**JEFFERSON COUNTY PUBLIC SCHOOLS/JEFFERSON COUNTY BOARD OF EDUCATION, Appellant,**

v.

**Mary Alice STEPHENS, Hon. Donna H. Terry, Administrative Law Judge, and Workers' Compensation Board, Appellees.**

No. 2006–SC–0320–WC.

Supreme Court of Kentucky.

Dec. 21, 2006.

Carole Meller Pearlman, Wyatt, Tarrant & Combs, LLP, Louisville, Counsel for Appellant, Jefferson County Public Schools/Jefferson County Board of Education.

Ched Jennings, Jennings Law Office, Louisville, Counsel for Appellee, Mary Alice Stephens, et al.

## OPINION OF THE COURT

The Workers' Compensation Board (Board) and the Court of Appeals have affirmed an Administrative Law Judge's (ALJ's) finding that the fall in which the claimant broke her hip was work-related. Appealing, the employer continues to assert that the fall was idiopathic (i.e., that it was caused by something personal to the claimant rather than the employment), that it was not compensable, and that the ALJ shifted the burden of proof to the employer. Having concluded that the ALJ did not shift the burden of proof to the employer or otherwise misapply the law to the facts of this case, we affirm.

The claimant worked as an order and receiving clerk at a school. Her job required her to order materials and textbooks, to check orders as received, and to deliver the items to the proper recipients. She also worked at the school's front desk. On January 16, 2004, she walked from the office in the copy room into the hallway. After stepping from the carpeted area to the tile surface, she fell and broke her left hip. She returned to work on July 1, 2004, but retained a 15% impairment and restrictions.

When deposed, the claimant described the incident in which she fell as follows:

I needed to go to the bathroom, so I got up and went across the office in the copy room into the hallway where the bathroom is. And when I came off the carpet into the hallway, I lost my footing. I don't—and I just fell. I don't know. My teachers come in that way to sign in. We carry water across there for the coffee pot. I can't honestly say if there was anything on the floor or not. . . .

Asked where she actually fell, she responded, "In the hallway in front of the bathroom. I went off the carpet onto the tile and I lost my footing."

Although the employer acknowledged that the injury occurred at work, it denied the claim on the ground that it resulted from an idiopathic fall. It based this assertion upon EMS and emergency room records, which indicated that the claimant related a history of experiencing some dizziness, seeing spots before her eyes, and feeling weak just prior to the fall. They also indicated that she rated her pain at 10 out of 10 and stated that she could not remember what happened.

Dr. Brooks–Horrar performed a neurology consult at the hospital on the day of the incident. Dr. Brooks–Horrar recorded a history indicating that the claimant got up from her desk, went to walk across the

hall, turned a corner, and experienced a sudden darkening of vision. She reached to catch herself but fell and fractured her hip. She "came to" immediately upon hitting the floor. There was no reported history of seizures, and although the claimant had apparently had some episodes of blackout spells in the past, an evaluation had been performed and was negative. She had not had any in about nine years. At present, the claimant was alert, spontaneous, and in mild pain that increased with left leg movement. Her speech was fluent, and she was able to give a clear history. Dr. Brooks–Horrar concluded that the claimant fell "after an episode most consistent with presyncope, nontypical of seizure or transient ischemic attack."

The claimant underwent surgery on January 17, 2004, and remained hospitalized until January 23, 2004. A discharge summary prepared by Dr. Ray included a diagnosis of presyncope possibly related to orthostasia.[1] The report indicated that the claimant was admitted after a fall in which she injured her hip. She had denied any loss of consciousness with the event, palpitations, chest pain, or headache but did "have a flash of darkness in her vision that was just an instant in time." Dr. Ray noted that a neurologist had concluded that "her episode was consistent with presyncope, completely nontypical of seizures or TIA." He concluded, "There was no etiology really found for her presyncopal episode other than just possible orthostasia. Of note, though, she has not been orthostatic while she is here." Noting that her sodium had been slightly low, he doubted that it caused her problems.

At the hearing, the claimant testified that she was heavily medicated due to pain from the hip fracture and did not remember Dr. Brooks–Horrar's visit on January 16, 2004. She denied a history of blackout spells and denied feeling light-headed before the injury. She described any spots she might have seen as being floaters.

The ALJ determined that the evidence did not establish any increased risk due to the proximity of any object in the school environment, noting that "this was simply a fall straight to a level floor." The ALJ also determined:

[T]here is no evidence of record that, despite Ms. Stephens' statements regarding spots before her eyes or some darkening of vision just before she fell, that she had a syncopal episode and Dr. Ray appears to have ruled out the only possible cause for that phenomenon when he noted that Ms. Stephens had not been orthostatic while hospitalized.

Finally, the ALJ noted that there was no other evidence of othostasia since the claimant's release from the hospital and no evidence that any of her prescriptions could have accounted for the fall. The ALJ concluded:

After carefully considering the evidence of record, the [ALJ] finds that Ms. Stephens' testimony is entirely credible and that she simply fell after stepping from a carpeted area to a smoother tile surface in the hallway. This appears to be simply a fall near the juncture of a change in walking surfaces and was not caused by presyncope, syncope, or loss of consciousness. It was not an idiopathic fall. Based upon the foregoing,

1. *Taber's Cyclopedic Medical Dictionary,* (19th ed.2001), indicates that presyncope means near fainting or the sensation that one is about to pass out. Syncope means fainting or loss of consciousness. Orthostasia means dizziness or loss of consciousness due to a signif- icant increase in pulse rate and drop in blood pressure upon rising from a supine to sitting or a sitting to standing position. The dictionary includes criteria for obtaining a positive diagnosis.

the issue of work-relatedness and causation is resolved in favor of Ms. Stephens.

Among other things, the employer's petition for reconsideration took issue with the ALJ's statement that there was no evidence of record that the claimant "had a syncopal episode" and that Dr. Ray had "ruled out" presyncope. The ALJ denied the petition as being no more than a reargument of the causation issue, after which the employer appealed.

KRS 342.0011(1) requires a compensable injury to arise out of and in the course of the employment. Although KRS 342.285 designates the ALJ as the finder of fact, a finding that is arbitrary, capricious, or clearly erroneous is subject to reversal on appeal. *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky.1986), explains that a finding may only be affirmed if it is reasonable and supported by substantial evidence.

The burden is on an injured worker to prove every element of her claim, including that a workplace injury arose out of the employment. *See Workman v. Wesley Manor Methodist Home*, 462 S.W.2d 898 (Ky.1971); *Stasel v. American Radiator & Standard Sanitary Corp.*, 278 S.W.2d 721 (Ky.1955). As explained in Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law*, § 4 (2006), an analysis of whether a work-related injury arises out of employment begins with a consideration of the three categories of risk: 1.) risks distinctly associated with employment (e.g., machinery breaking, objects falling, explosives exploding, fingers getting caught in machinery, exposure to toxic substances); 2.) risks that are idiopathic or personal to the claimant (e.g., a disease, internal weakness, personal behavior, or personal mortal enemy that would have resulted in harm regardless of the employment); and 3.) neutral risks (e.g., a stray bullet, a mad dog, a running amuck, lightning). Where an employment and personal cause combine to produce harm, the law does not weigh the importance of the two causes but considers whether the employment was a contributing factor.

Although one naturally infers that a fall in the workplace has something to do with the employment, proving that it arose out of the employment can be problematic when the reason that it occurred is unexplained. *Workman v. Wesley Manor Methodist Home, supra*, stands for the principle that an unexplained workplace fall is presumed to arise out of the employment unless the presumption is rebutted. The court determined subsequently in *Indian Leasing Company v. Turbyfill*, 577 S.W.2d 24 (Ky.App.1978), that even an idiopathic fall may be compensable if work placed the individual in a position that increased its dangerous effects.

We explained in *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 95 (Ky.2000), that rebuttable presumptions are governed by KRE 301. Such a presumption shifts the burden of going forward with evidence to rebut or meet it to the party against whom it is directed, but it does not shift the burden of proof (i.e., the risk of nonpersuasion) from the party upon whom it was originally cast. If a presumption is not rebutted, the party with the burden of proof prevails on that issue by virtue of the presumption. If a presumption is rebutted, it is reduced to a permissible inference. The ALJ must then weigh the conflicting evidence to decide which is most persuasive.

Because a fact must be proved with substantial evidence, a rebuttable presumption must be met with substantial evidence. Therefore, an employer asserting that a workplace fall was idiopathic

must meet the presumption with substantial evidence to that effect. If the employer does so, the ALJ must weigh the conflicting evidence, including the permissible inference that a workplace fall arises out of the employment. The burden of persuasion remains on the worker.

The reason for the claimant's fall was not facially apparent. As the Court of Appeals pointed out, people generally do not fall when walking from a carpeted surface onto tile. The claimant stated that she lost her footing but offered no explanation for the reason. There was no evidence that she tripped over the threshold between the office and the hall and no evidence of an obvious risk (such that the hall was wet, that it was slippery, or that a tile was loose). There was also no evidence that she fainted or was unconscious when she fell. Under *Workman v. Wesley Manor Methodist Home, supra*, the claimant was entitled to a rebuttable presumption that the fall arose out of her employment.

▪▪ It was the employer's burden to go forward with substantial evidence of a non-work-related cause for the claimant's fall in order to rebut the *Workman* presumption. Asserting that the fall was not unexplained but idiopathic, the employer presented medical evidence to that effect. Because the employer produced substantial evidence to meet the presumption, it was reduced to a permissible inference. The claimant retained the burden to prove that the fall arose out of the employment.

▪ The history recorded by EMS and hospital personnel indicated that the claimant had experienced some dizziness, saw spots before her eyes, and felt weak just prior to the fall. After ruling out other medical causes and noting that the claimant had reported some previous blackout spells, that none had occurred within the past nine years, and that testing had been negative, Dr. Brooks–Horrar concluded that she fell after an episode "most consistent with presyncope." Dr. Ray's discharge diagnosis included presyncope. He noted, however, that no etiology for the episode was found except possibly orthostasia and that orthostasia had not occurred during her hospitalization. Although the physicians suspected that orthostasia might be what caused the claimant to see spots or have darkened vision before the fall, nothing indicated that they performed the testing required for a positive diagnosis. The claimant later denied feeling light-headed before she fell, stated that any spots she may have seen were floaters, and denied a prior history of blacking out. The ALJ believed her.

The employer asserts that the ALJ erred when stating that there was no evidence that the claimant had a "syncopal episode" and then stating that Dr. Ray "appears to have ruled out" orthostasia, the only suspected cause of such an episode. The employer also asserts that the absence of orthostasia while the claimant was hospitalized was immaterial because she was in bed. Having reviewed the ALJ's decision, we are convinced that it was not the product of a misunderstanding or a misapplication of the law.

Because there was no lay or medical evidence that the claimant developed syncope, fainted, or lost consciousness immediately before the fall, there was no evidence of a "syncopal episode." The only evidence that she had ever experienced one was the history that Dr. Brooks–Horrar recorded. The claimant later denied that history, and the ALJ believed her.

There was no medical evidence regarding the likelihood that an individual who experiences an episode of presyncope will develop syncope or will fall, faint, or lose consciousness. Dr. Ray's discharge sum-

mary noted that the claimant was not orthostatic during her weeklong hospital stay. Nothing indicated that she was bedridden throughout the stay or that she failed to rise from supine to sitting or from sitting to standing. Although the statement that Dr. Ray appeared to have ruled out orthostasia as an explanation for the symptoms was not entirely accurate, Dr. Ray did appear to question whether the condition had occurred because it did not occur again at the hospital. It was reasonable to conclude that his statements called the diagnosis of presyncope into question because orthostasia was the only explanation offered for it.

The ALJ determined that the claimant's fall was not caused by presyncope, syncope, or loss of consciousness; that it was not idiopathic; that it was unexplained; and that it was compensable. The conclusion was supported by the claimant's testimony denying the symptoms that formed the basis for a diagnosis of presyncope and the permissible inference that an unexplained workplace fall is work-related. Together, they constituted substantial evidence that the fall arose out of the employment. Because the employer's evidence was not so overwhelming as to render the conclusion unreasonable, it was properly affirmed on appeal.

The decision of the Court of Appeals is affirmed.

LAMBERT, C.J., and GRAVES, MINTON, NOBLE, SCOTT, and WINTERSHEIMER, J.J., concur.

McANULTY, J., not sitting.